DARBY INVESTMENT CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 82187. Filed January 31, 1962.

*Frank C. Smith, Esq.*, for the petitioner.
*Julian R. Ettelson, Esq.*, for the respondent.

#### OPINION.

WITHEY, *Judge:* Deficiencies have been determined by the respondent in the income of petitioner for the taxable years ended August 31, 1956 and 1957, in the respective amounts of $1,778.46 and $2,427.21.

---

The only issue is whether respondent has erred in adding to petitioner's gross income for each year a part of each monthly payment received by petitioner from Michigan land contracts representing partial collection of discount income where petitioner had purchased the vendor's interest in such contracts at a discount.

All of the stipulated facts are found and we adopt the portion of the stipulation of facts necessary for our decision as our detailed findings of fact.

Petitioner Darby Investment Corporation, hereinafter sometimes referred to as Darby, is a corporation organized on August 15, 1955, under the laws of the State of Michigan. Its authorized capital at the date of incorporation was 2,500 shares of common stock at $100 par value. Since its organization Darby has been engaged primarily in investing its funds in the vendor's interest in land contracts. Darby accounts for and reports its income on a cash receipts and disbursements method.

Darby filed corporate income tax returns (Forms 1120) for the taxable years ended August 31, 1956 and 1957, with the district director at Detroit, Michigan.

There are involved in this case 76 land contracts purchased by the petitioner, during its fiscal years ended August 31, 1956 and 1957, at a discount, that is to say, at an amount less than the unpaid balance due upon the face of each contract. Darby performed no services in the making of the contracts, but only purchased land contracts negotiated by others. In each instance the price paid was an agreed percent less than the principal amount due on the contract, the difference being the discount in question.

Each contract provided for a downpayment by the land contract vendee upon the execution and delivery of the contract. The remaining unpaid principal balance was to be paid by monthly payments of a specified amount, which monthly payments were to include interest at 6 percent per annum on the whole principal sum that was from time to time unpaid. The legal title to the premises was retained by the land contract vendor until the terms of the contract were fully completed.

In reporting its income Darby treated no part of the monthly payments on the contract as earned discount.

The deficiencies determined against Darby for the fiscal years ended August 31, 1956 and 1957, were based on the determination by the Commissioner that each monthly payment represents:

1. Interest.
2. Recovery of cost.
3. Discount.

The full particulars concerning the date the petitioner acquired

each land contract, the unpaid principal balance as of the date of acquisition, petitioner's cost, the amount of the discount, collections on the unpaid balance of the contract, and interest for the fiscal years ended August 31, 1956 and 1957, are as set forth in Exhibits 3–C and 4–D which are made a part hereof by reference. The land contract listed in Exhibit 3–C as 4451 Farrand Road is not here at issue.

The discount income in dispute for the fiscal year 1956 is the amount of $5,928.21 and for the fiscal year 1957 is the amount of $8,011.05.

Approximately 90 percent of the land contracts were purchased by the petitioner from builders. The builder had erected a "shell" house which was to be finished by the land contract vendee, as more fully explained below. The builder would enter into a land contract with the land contract vendee which provided for a downpayment upon the execution and delivery of the contract, and for the unpaid principal balance of the contract to be paid by monthly payments as explained above. Typically, the terms of most land contracts, covering new and used homes, provided for full payment in approximately 11 years, 7 months. Generally, the petitioner did not anticipate holding the land contract for the full term provided for in the contract. At the time the petitioner purchased the vendor's interest in the land contract from the builder, possibly one, but never more than two, of the monthly payments provided for by the terms of the land contract had been paid by the land contract vendee.

Land contracts purchased from a builder invariably covered a "shell" house. The inside of the house was unfinished. Invariably the builder delivered to the premises materials and equipment necessary for the completion of the house. Among the items delivered to the premises were:

1. 3,000 feet of sheetrock.
2. 1,000 feet of oak flooring.
3. Stool, tub, lavatory, and shower.
4. 1,700 feet of installation.
5. 50-gallon hot-water heater.
6. Kitchen sink.

Most of the land contracts contained a provision under which the vendee was required to complete the interior of the house within 6 months to a year from the date of the contract. Invariably, the building permits issued to the builder required that the building be completed within a year from the starting date and that the home pass a municipal inspection concerned chiefly with sanitation and electrical wiring at the end of a year. Most of the land contracts specifically provided that the title to all of the personal property supplied to the premises should remain in the seller and that said items were accepted by the vendee for the sole purpose of annexing

same to the premises and improving the premises and for no other purpose.

The vendee was thus required to apply the sheetrock to the walls and ceiling, lay and finish the flooring, install the insulation, hang and finish doors, install the plumbing fixtures, and install the hot-water heater and kitchen sink as set forth above. In addition to the above-described improvements, it was practically necessary that the vendee install kitchen cabinets and purchase and install light fixtures and paint the premises, all at his own expense.

The increase in the cash value of the property, resulting from the completion of construction by the land contract vendee was of prime importance to the petitioner. Savings and loan associations and banks were during the years involved limited in the acquisition of vendors' interests in land contracts to paying not more than 65 percent of the appraised value "when complete" of properties subject to land contracts. Such financial institutions could not acquire such properties where construction was not complete.

It was anticipated by petitioner, upon acquisition of land contracts on uncompleted homes, that over a period of several years the cash value of the property by reason of completion combined with a decrease of the unpaid balance of the contract would permit the contract vendee to refinance his purchase by a conventional mortgage, it being to the advantage of the vendee to do so.

The average fair market cash value of each of the "shell" houses covered by the land contracts involved when completed by the vendee was 29 percent over its fair market cash value as a "shell."

The builder would execute and deliver a warranty deed to the property to petitioner. Concurrently, the builder executed and delivered an assignment in duplicate of the land contract to the petitioner. The builder's title and interest in the items of personal property which the builder supplied to the vendee for the expressed purpose of improving the premises and to which he had retained title were thereby transferred to the petitioner. The petitioner sent a copy of the assignment to the land contract vendee, thereby advising the vendee that all future payments on the contract were to be made to the petitioner.

In addition to the improvements required of the land contract vendee, some of the land contract vendees financed the construction of a garage and other improvements through FHA, Title One, Improvement Loans. The Title One loans did not constitute liens against the premises. Thus, in some instances, the fair market value of the premises was increased by $300 to $500 over and above the "when completed" cash value of the premises.

Approximately 10 percent of the land contracts involved were those covering used homes, approximately 20 to 30 years old, and were pur-

chased at discounts of from 10 to 23 percent from an individual. These individuals, in order to obtain a greater amount of cash than the downpayment on a land contract would sell their vendor's interest in the land contract to the petitioner. These used homes were in more stable neighborhoods than were the "shell" homes purchased by the petitioner from the builders. Their cash value over the immediate future was more readily predictable.

All of the appraisals of premises covered by the subject land contracts, with but one or two exceptions, described the marketability in the district in which the premises were located as "good." The trend in the district was described as "static."

Land contracts of the type involved in this case had been, in Michigan, for many years prior to the time here involved a common method of financing the sale of urban and suburban, residential one- and two-family, new and used homes where other than cash sales are involved.

Such land contracts were during the period here involved and for many years prior thereto assignable, sold, purchased, and freely transferred in the State of Michigan. There existed a ready market for their sale or purchase.

The fair market value of each land contract here involved was equal to petitioner's cost basis with respect thereto.

The monthly payments on the land contracts here involved in fact included a partial collection of cost, interest, and discount income.

The sole issue here is whether, as respondent contends, petitioner must include as income received with each monthly payment under the contracts not only the interest called for thereby, but an additional portion thereof which represents installment realization of discount income. It is conceded that the discount is gain in the form of ordinary income which must be reported when realized. Difference arises only as to the time of realization. Petitioner contends it can be required to report the discount as ordinary income only upon its realization, which it urges can only occur after it has recovered its cost. The parties agree as to the amount of petitioner's costs. Thus, the issue is narrowed to the query: Whether, in receiving that portion of each monthly contract payment, after the deduction of interest, petitioner has realized income measured by a pro rata portion of the discount at which the contract was purchased.

We and other courts have held that a Michigan land contract is in the nature of a purchase money real estate mortgage, that it is an evidence of indebtedness in the nature of a bond or note, and that it is readily and freely negotiated by assignment to an existing market. *Arthur E. Wood*, 25 T.C. 468; *Commissioner* v. *Hart*, 76 F. 2d 864.

When such interests are purchased at discount, the purchaser having performed no services in connection with the sale of the real estate

originally conveyed thereunder, has done nothing more than to make a money investment in the contract itself. In this instance we have found as a fact that the fair market value of each contract here involved was equal to petitioner's cost in the purchase thereof.

Petitioner's case is pitched upon the principle that where an evidence of indebtedness is purchased at a discount from its face and the transaction is a speculative investment as where the purchaser is not reasonably certain of ever recovering his cost he may recover his cost first before reporting any portion of amounts received in payment as realized discount income. The petitioner rests its position upon the holdings in *Burnet* v. *Logan*, 283 U.S. 404, and *Harris Trust & Savings Bank, Executor*, 24 B.T.A. 498, and others of similar import. We think petitioner is not justified in relying upon these cases. The underlying rationale of those authorities is that the evidences of indebtedness there involved were speculative and therefore uncertain as to cost recovery because of a lack of security, because of no reasonable certainty as to the obligor's ability to pay and, generally, that they had no ascertainable fair market value. Here the contrary is true. The contracts had a fair market value equal at least to petitioner's cost and were readily salable to an existing market. As for the security aspect thereof it is obvious that, except for the ordinary business risks such as fluctuating market conditions, petitioner was amply secured as to his recovery of cost. He retains legal title to the real estate and improvements originally sold under each contract. Although he holds only bare legal title, he may, upon default of the vendee, under Michigan law, rescind any contract, recover the equitable title to the property conveyed, and resell the same without accounting to the original vendee for any amount thereby received in excess of the balance due upon the original contract. Under the terms of the majority of the contracts before us whereby so-called "shell" homes were sold and purchased, petitioner's security, except again for fluctuations of the market, was enhanced as payments were received for the vendees, in each instance, were bound to increase the value of the houses on an average of 29 percent by minimum improvements thereto. It is stipulated in effect that with respect to contracts covering older homes, petitioner's security was reasonably certain for they were located in established neighborhoods where the values of real property were readily ascertainable.

It is clear that the facts before us distinguish this case from those above cited and that it falls within a long and consistent line of authority, holding that where evidences of indebtedness such as negotiable bonds, notes, and mortgages payable in installments with interest are purchased at discount, and where when purchased they have an ascertainable fair market value less than the amount due and

payable thereon, the payments each include, after deduction of interest, realized discount income in proportion to the difference between the taxpayer's cost and the principal balance due upon the face of such instruments at the date of taxpayer's purchase thereof. *William A. Tombari*, 35 T.C. 250; *Phillips* v. *Frank*, 185 F. Supp. 349 (W.D. Wash.); *Victor B. Gilbert*, 6 T.C. 10; *Vancoh Realty Co.*, 33 B.T.A. 918; *Shafpa Realty Corporation*, 8 B.T.A. 283; *Florence L. Klein et al.*, 6 B.T.A. 617. As we stated in *Shafpa*, "It is no more correct to say that the part payment [monthly contract payments here] was all a return of principal than it is to say that it was all a return of income."

*Decision will be entered for the respondent.*