UNITED STATES of America

v.

Otto W. HEIDER, Sr., and Irene E.
Lawrence, Defendants.

No. C–19115.

United States District Court
D. Oregon.

May 8, 1964.

The United States was represented by Sidney I. Lezak, Acting U. S. Atty., and Charles H. Habernigg, Asst. U. S. Atty., of Portland, Or., and Jack Cotton, Dept. of Justice, Washington, D. C.

Defendants were represented by William E. Dougherty and H. Myron Gleason, Portland, Or.

SOLOMON, Chief Judge.

Otto Heider and his confidential secretary, Irene Lawrence, were indicted for wilfully filing false and fraudulent income tax returns on behalf of Heider[1] for the years 1953 and 1954 in their attempt to evade income taxes owing by Heider in the amounts of $141,252.04 and $131,646.38 respectively.

Defendants are residents of the town of Sheridan, Oregon, where Heider was engaged in the practice of law for many years and until the time of his disbarment in 1959. Heider's primary occupation, however, was money lending. He made some real estate loans, but primarily he made loans on motor vehicles and heavy equipment. He engaged in some flooring arrangements with local retailers, and he handled rental properties. Heider also received income from a garage and repair shop which he operated primarily for the purpose of making serviceable the equipment which he repossessed.

Heider's books and records concerning the prosecution years were in bad shape. His accountants, as well as the accountants for the Government, were required to construct a set of books, partially from the records which Heider kept but primarily from the original contracts, deposit slips, and cancelled checks. During the two years in question, there were more than 300,000 entries. Subsequent to the indictment, the attorneys and accountants for defendants spent many months with the attorneys and accountants for the Government in an effort to agree upon the authenticity of documents and entries. The results of such meetings may best be illustrated by the schedules on vehicular inventories. These lists contained 1700 items. They agreed on the correctness of all but 16 of them. Had there been no such cooperation, this case probably would have required at least a year to try. Actually, it was tried in 11 trial days.

The evidence showed that Heider was under investigation for tax deficiencies for the years 1939 through 1951. These deficiencies were settled, and defendant paid approximately $300,000.00 in taxes, interest and penalties. Thereafter, an investigation of Heider's tax returns for the years 1952 through 1954 was commenced. However, prior to the indictment in this case, the statute of limitations for the year 1952 ran. Thereafter, defendant for the first time disclosed a group of contracts totaling $268,000.00 which had been in existence in the year 1952.

The Government relies primarily on the net worth method of accounting to prove non-reported taxable income during the prosecution years. The Government also adduced evidence of omitted as well as falsified items of income. In general, the defendants do not contest the Government's figures concerning receipts and expenditures; instead, they attack the Government's opening and closing net worth balances.

It was to defendants' advantage for Heider to have a high opening net worth and a low closing net worth. As to some items, they contend that Heider was prejudiced by utilizing proper but imprudent accounting methods. As to other

---

[1]. Heider and his wife filed joint returns, but the wife had no independent income and the Government does not contend that she knowingly or wilfully participated in the filing of these returns. In this opinion, Heider alone will be referred to as the taxpayer.

items which Heider reported, they assert that he was not required to report them or that he failed to take the full deductions to which he was entitled.

From disclosures made by Heider's attorneys and accountants after indictment but before trial, from Heider's books and records made available to the Government during and prior to trial, from explanations given on many questioned items of income and expenses, and from evidence disclosed and theories advanced for the first time by defendants during the trial, the Government on numerous occasions revised downward net taxable income, the tax on which Heider is alleged to have evaded. The Government's latest figures on Heider's net taxable income are $5,999.70 for the year 1953 and $97,046.95 for the year 1954.

Defendants contend that the Government erred in refusing to allow Heider credit for a $69,800.00 cash hoard which they say Heider had on the day of the opening balance but which he did not deposit until 1954. They also claim that the Government erred in refusing to give Heider a $97,703.74 increase in River Bend Garage inventory as of December 31, 1952.

I shall examine these and other contentions made by the defendants. However, I shall not detail the evidence on the question of the intent of the defendants to cheat the Government. The evidence on this issue was clear and convincing. Defendants Heider and Lawrence kept incomplete books and records; they maintained their own methods of accounting which were often unintelligible to anyone else; they deliberately omitted receipts; and they wrote checks in greater amounts than the payees actually received, and yet recorded the higher amounts as disbursements in their books.

Although there is no evidence that the defendant Lawrence personally profited by such schemes, there is ample evidence that she knowingly participated in them. Heider did not seriously deny such intent, nor has he argued that is-sue. He merely contends that an examination of all of the transactions during the years 1953 and 1954 will reveal that, regardless of his intent, he did not owe a tax for these years.

## CASH HOARD

Defendants contend that the opening net worth balance was understated by $69,800.00, represented by cash which Heider had withdrawn from his business during 1951 and 1952 and had secreted in his basement. They assert that this fund was then re-introduced in his business during the early months of 1954 in the form of false loans from relatives and friends. The Government contends that there was no cash hoard, but that these falsely labeled deposits of 1954 represent undisclosed cash receipts.

Heider and his wife were the only witnesses who testified on this issue. Both are vitally interested in the outcome of this prosecution. Moreover, Mrs. Heider's testimony was not always coherent. She failed to explain satisfactorily the dates on which the money was withdrawn; why the entries in her household book concerning this cash hoard, allegedly made over a period of months, were made with the same pencil; or why the pages concerning the cash hoard remained in the book while other and more recent household records had been destroyed.

During the investigation leading up to this prosecution, Heider gave Agents Clark and Adams a sworn statement that he had no cash on hand during the prosecution years other than that which he had previously disclosed. Heider first disclosed the cash hoard only after the statute of limitations had run on the years 1951 and 1952 and only after the Revenue Agents had discovered a number of false loans, including one for $9,000.00 allegedly made by Irene Lawrence.

I find that there was no cash hoard and that the opening net worth balance should not be increased.

## INVENTORY OF REPOSSESSED VEHICLES AND EQUIPMENT

Defendants contend that Heider's opening net worth is understated by $66,125.00 due to the Government's refusal to accept book value as the proper valuation for repossessed vehicles and equipment carried forward from December 31, 1951, inventory. Defendants claim that the value of 1951 inventory was $78,275.00, that approximately $10,000.00 in equipment was sold or scrapped in 1952, and that the value of the inventory still in stock on December 31, 1952 was $68,700.00.

The Government contends that $10,000.00 is the agreed value of the December 31, 1951, inventory; that $7,425.00 of this equipment was sold during 1952 and that the valuation of vehicles and equipment carried over from December 31, 1951, to December 31, 1952, should be $2,575.00.

If the defendants' contention is correct, it would reduce Heider's 1953 income by $63,925.00. According to defendants, one truck valued at $2,200.00 remained in inventory on December 31, 1954.

The dispute is based on different interpretations of Heider's tax settlement for the years 1939–1951. Revenue Agent Cosper, in assessing Heider's net worth on December 31, 1951, found the book value of repossessed vehicles and equipment to be $78,275.00. Cosper's figures showed that Heider's total net worth on that date was $1,039,438.61.

Heider claimed that the net worth figure was much too high, and he asserted that this figure was in part due to the excessive valuation of the inventory of repossessed vehicles and equipment. Specifically, Heider contended that the book value did not accurately reflect true value and that the vehicles and equipment which he had on hand on December 31, 1951, had no value other than for junk.

Based upon Heider's protest and Cosper's personal inspection of the inventory, Cosper agreed that its value should be written down to $10,000.00. Although no formal settlement was entered into as permitted by Sections 3760 and 3761 of the Internal Revenue Code of 1939, 26 U.S.C.A. (I.R.C.1939) §§ 3760, 3761, the taxes paid by Heider were based upon the agreed write-off. Thereafter, Heider used the $10,000.00 figure as the valuation of this inventory at the end of 1951 in his books, and he also used that figure in his income tax returns for 1952, 1953 and 1954. In other words, after consulting with his accountants, Heider, in his later income tax returns, did not write off the losses incurred in the ultimate disposition of these assets, on the theory that the losses had already been taken. The Government contends that this treatment was the only proper way it could have been handled.

Moreover, the income tax regulations afford a legal basis for reducing the book value of the inventory as requested by Heider.[2] Having succeeded in getting the Internal Revenue Service to reduce the value of the inventory from $78,275.00 to $10,000.00 for the purpose of determining his income taxes for prior years, Heider may not thereafter disregard that reduction and use the higher figure for the purpose of determining his tax liability in future years.

In support of their theory that the opening net worth balance for this item was understated by $66,125.00, defendants attempted to show that Heider suffered substantial losses in the sale of this inventory in 1953. Defendants offered a group of receipts totaling $7,135.96 which they claim represent the scrap value of these assets on liquidation. In my view this evidence supports rather than defeats the Government's

2. "Any goods in an inventory which are unsalable at normal prices or unusable in the normal way * * * including second hand goods taken in exchange, should be valued at bona fide selling prices, less cost of disposition * * * but in no case shall such value be less than the scrap value." Federal Income Tax Regulations (1939 Code) Section 39.22 (c)–2 (c).

contention that most of this opening inventory was junk not worth more than $10,000.00.

In addition, none of these receipts refer specifically to items included in the December 31, 1951, inventory. The receipts merely indicate that Heider made sales of used parts at various times in 1953. Of the $7,135.96 in receipts offered, one, in the amount of $3,005.50 is a carbon copy of another and both were counted. Receipts totaling only $341.20 specifically indicate sales of "scrap," "junk," or its equivalent.

■ The testimony of Agent Cosper as well as Heider's books and records, amply support the Government's contention that December 31, 1951, inventory of repossessed vehicles and equipment should be valued at $10,000.00. It therefore follows that the Government's opening net worth balance for this item is correctly stated.

### ADDITIONAL INVENTORY— DECEMBER 31, 1952

■ Defendants seek to increase Heider's opening net worth by $16,504.84 because of assets alleged to be on hand as of that date but not included in the Government's figures. If defendants are correct, Heider's 1953 income would be decreased by the same amount.

Of this amount $2,522.50 related to equipment which the Government claims was scrapped in 1952 but which defendants claim was scrapped in 1953. Heider took a partial loss on this equipment in his 1952 return, and he claims that he inadvertently failed to charge off the balance of $2,522.50 in 1953. The Government failed to establish the date this equipment was scrapped. The opening inventory should be increased by $2,-522.50.

■ Defendants also claim a $5,718.-58 increase in opening net worth by reason of the sale of a truck and trailer in early 1953 for which there is no record of the time these assets came into Heider's possession. The defendants introduced checks totaling $12,116.38, dated in 1952, to prove Heider's purchase of the assets in that year for $12,114.00. Two of these checks show Heider's method of operation. Heider issued the checks in the total amount of $5,397.80 payable to the bank. The bank issued two cashier's checks in the amount of $4,397.80 to the seller and gave Heider $1,000.00 in "change". Heider's records show the amounts of his personal checks as the amount paid to the seller. The Government credited Heider with $4,-397.80, the amount actually paid to the seller on the cashier's checks, plus $2,-000.00, the amount of a third check, all of which could be traced directly to the purchase of the truck and trailer. I cannot allow as a credit the remaining three checks which total $4,718.58 because the relationship of these checks to the truck and trailer is fictitious. If the $1,000.00 "change" is included in the total of checks offered by the defendants as evidence of the purchase, the total is $2.68 more than the purchase price, but it is short $1,511.00, if the interest and insurance costs are included.

■ As to the remaining $8,263.73 in equipment, defendants were unable to establish dates of acquisition. The Internal Revenue agents made a thorough search of Heider's contracts and other records, as well as records of the State Motor Vehicle Department. They were unable to find any of this equipment in the December 31, 1952, inventory.

All of the defendants' claims in this category are denied, except for the $2,-522.50; 1953 income is therefore decreased by that amount.

### ADJUSTMENT TO APPRAISED VALUE

■ Defendants assert that the Government's value on equipment repossessed during 1953 and 1954 should be reduced by $18,896.55. If defendants are correct, Heider's income in 1953 and 1954 would be reduced by $6,973.23 and $11,923.32, respectively.

In some instances, Heider assigned a value to repossessed equipment on his income tax return for the year of re-

possession. The Government, for the purpose of discovering Heider's net worth, assigned the net balance due on the contract in those instances in which Heider failed to assign an appraised value. Defendants assert that oversight was the cause of the failure to assign a value in all cases. Therefore, they contend that items repossessed in 1952 through 1954 which were still on hand on December 31, 1954, but which had not been assigned an appraised value, should be given a value which corresponds to the appraised value assigned by Heider to other items repossessed and sold during those years. They derive a percentage for each of the three years (66.57% in 1952; 50.23% in 1953; and 63.99% in 1954) by ascertaining the ratio of appraised value to net balance due on the contract for those items to which Heider did assign an appraised value in the year of repossession. That percentage is then applied to the items to which Heider did not assign a value on repossession in order to determine the value of that asset.

There is no basis for the contention that Heider failed because of oversight to assign a value to repossessed items at the time of repossession. Of the 27 disputed items repossessed in 1953 and 1954, for which defendants seek a credit of $18,896.55, none were reported on Heider's 1953 and 1954 returns. However, Heider did report 10 repossessed items in his 1954 return, and in each case the item was both repossessed and sold in 1954, and the value assigned to the repossessed item was identical to the price for which it was resold. In some of these cases, the net balance due at the time of repossession and the resale price were the same.

Heider often assigned the net balance due at the time of repossession as the appraised value, and in these instances did not report a gain or loss until the equipment was resold. If he had assigned a value other than the balance due, he would have been required to report the gain or loss in that year's income tax return. Since Heider deliberately elected not to report any of the disputed items in his 1954 return, it is reasonable to infer and I find that he determined the value to be the same as the balance due on the contract on the date of repossession.

I find that the method used by the Government to determine the value of repossessed items was proper in this case and that defendants are not entitled to any adjustment.

## CAPITALIZATION OF REPAIRS

■ Defendants complain that the Government ignored the method employed by Heider's accountants in capitalizing River Bend Garage repairs. A portion of Garage repair expenses was capitalized on Heider's income tax returns for 1952 through 1954. On his income tax returns, Heider capitalized $14,473.21 in 1952, $15,649.33 in 1953, and $14,760.37 in 1954. Defendants assert that Heider intended to write off this capitalized portion the following year, but each year he forgot to do it. In reconstructing Heider's income, the Government allowed these amounts as expenses to the garage during the year in which the expenses were incurred. Heider claims that the amounts capitalized were valid assets on December 31 of each of the years. If defendants' contention is allowed and the amounts are written off in subsequent years, unreported taxable income alleged by the Government would be increased in 1953 by $1,176.72 and decreased in 1954 by $889.56.

Allowing defendants' contention would improve the Government's case for the year 1953. However, I do not believe that the facts support defendants' contention. There are no business records which show what repairs were expended for the purpose of making serviceable the equipment still in inventory on December 31 of each year. The amount capitalized by Heider in each year was an arbitrary one which he did not write off in subsequent years. Therefore, his method did not properly reflect income.

The method employed by the Government in determining Heider's net worth was proper.

## PARTS INVENTORY

■ Defendants presented a list purporting to show parts on hand on "January —— 1953," valued at $5,248.49. Solely on the basis of this list, they contend that the December 31, 1952, net worth should be increased in that amount to reflect this inventory of parts. This would decrease 1953 income by the same amount.

There are no records other than this undated list to support defendants' claim. No figures are offered to disclose the value of a parts inventory either on December 31, 1953, or December 31, 1954. For many years Heider expensed all parts used by the garage, capitalizing an arbitrary portion. He kept no record of parts on hand. Since there were no records, the Government, in its calculations, conceded the propriety of Heider's treatment, and permitted him to expense all such parts. Therefore, parts on hand have no place in Heider's inventory, and this claim is disallowed.

## CANNIBALIZATION

■ Defendants contend that Heider's closing net worth should be decreased by $10,232.06 on the theory that the value of all repossessed equipment in inventory for more than one year should be decreased by 25 per cent each year to account for cannibalization. Cannibalization is a term used by defendants to characterize Heider's practice of repairing equipment with parts taken from other equipment he had on hand. If defendants' contention is correct, it would reduce Heider's 1953 income by $1,572.50 and his 1954 income by $8,659.56.

The Government contests the application of the cannibalization ratio, claiming that it is a disguised depreciation schedule applied to non-depreciable assets.

While there may be some logic to defendants' contention, their theory is not supported by the evidence. They make this contention long after Heider filed income tax returns in which he claimed no such deduction.

Any write-off for cannibalization must depend on an identifiable event—a stripping of one asset and an addition to another. Defendants offer no such evidence. The 25 per cent per year reduction in inventory valuation is an arbitrary figure, arrived at through sheer conjecture. Even though defendants seek such treatment for December 31, 1954, they make no comparable reduction for inventory on December 31, 1952.

The Government's refusal to allow the cannibalization write-off is proper.

## REPAIRS

Defendants contend that Heider's closing net worth is overstated by $4,410.25 because of Heider's neglect to account properly for income from vehicular sales contracts which included parts or repairs. They assert that proper accounting would decrease the closing net worth by the same amount and thereby decrease Heider's 1953 income by $1,218.19 and his 1954 income by $3,192.06.

All parts and repairs provided in conjunction with these sales were expensed to the garage. However, the money collected on these contracts was applied to decrease vehicle basis; none was reported as income to the garage. As a result, the garage always showed a loss.

The Government contends that these payments should have been used to pay for parts and repairs first and then applied to the vehicle. Defendants say that this treatment is too conservative; that payments should be apportioned in a ratio comparable to the ratio these two components bear to the face of the contracts.

■ The Government's method is simpler and more rational, but either method would clearly reflect income. Heider used neither method. Since the method he used was clearly improper, he made no election. Since Heider made no election and since this is a criminal proceeding, I believe that the Govern-

ment should employ that method most advantageous to the defendants.

The Government's figures purporting to show unreported taxable income in 1953 and 1954 must be reduced by $1,218.19 and $3,192.06, respectively.

## VEHICLE LOANS RECEIVABLE

Defendants claim that the Government understated Heider's opening net worth by $2,672.50, which represents additional loans receivable from vehicle contracts existing on December 31, 1952. They also claim that Heider's closing net worth is overstated by $4,250.00, the amount of a duplication of a vehicle contract included in the Government's net worth schedules.

Defendants' contentions with respect to opening net worth are based solely on speculation and conjecture, except for the sum of $485.00.

■ There is no merit in defendants' claim of a duplication in the amount of $4,250.00. There were two transactions involving the same vehicle. Heider first sold it to Baird on a contract. Baird later sold the same vehicle to Hayman, and Heider financed this sale. Both debts were properly included in the closing net worth.

Heider's 1953 income should be reduced by $485.00.

## LOANS PAYABLE

■ Defendants contest Government figures showing an opening liability of $3,800.00 to the Sheridan Methodist Church. Defendants claim that the amount is merely the unpaid balance of a $4,000.00 pledge to the church. The effect of defendants' claim would be to reduce 1953 income by $3,800.00.

In a meeting with Agent Cosper, Heider acknowledged this $3,800.00 liability to the church during 1953, and at the trial Heider admitted that the church loaned him money and that during the prosecution years he owed the church a substantial sum. I find that the Government was correct in showing this liability.

## PREPAID INSURANCE

■ Defendants claim $2,527.36 as prepaid insurance on December 31, 1952. This would increase Heider's net worth on that date and decrease his 1953 income by that amount. However, Heider claimed no such asset on his 1952 or 1953 returns, and there are no records to substantiate his claim. In contrast, he did report such disbursements in 1954 and had records to show such policies were written and paid for in 1954.

On this showing the Government correctly refused to give Heider credit for prepaid insurance on December 31, 1952.

## LOANS RECEIVABLE

■ Defendants contend that the loans receivable account in closing net worth should be reduced by $3,484.38. Heider issued checks in that amount to "Otto Heider, Jr./Sheridan Funeral Home". Defendants claim that these checks represent funeral expenses financed by Heider and incurred prior to December 31, 1952. This contention would reduce Heider's 1953 income by $597.88 and his 1954 income by $2,886.50. The Government asserts that these payments represented either loans or gifts by Heider to his son.

Heider often financed funeral expenses. His records show payments on other accounts, but there are no contracts or records to support these claims totaling $3,484.38. Without records to substantiate defendants' claim, I am unable to find that these payments were expenses to Heider, particularly since Heider often used the "Escrow" account, to which these checks were charged, for loans and gifts to Otto Heider, Jr.

I find that the Government correctly charged these checks to Heider's personal account; they are properly included in his net worth on December 31, 1954.

## UNEARNED DISCOUNTS

Defendants contend that Heider's opening net worth is overstated by $481.01, that his December 31, 1953, net worth is overstated by $3,298.54, and that his December 31, 1954, net worth is over-

stated by $8,793.93 because Heider improperly reported income from contracts purchased at a discount. Defendants contend that proper reporting would have decreased Heider's net worth, as stated above, and thus reduce income in 1953 and 1954 by $2,817.53 and $5,495.39, respectively.

Heider, both in his own records and in his tax returns for the prosecution years, reported income from contracts purchased at a discount, ratably over their life. Now defendants seek to repudiate that reporting method and revise Heider's computations during the prosecution years in order to recapture principal first and defer income until later years.

▮ In civil cases, when a taxpayer chooses a method of reporting income, he is bound by that choice. Pacific National Co. v. Welch, 304 U.S. 191, 194, 58 S.Ct. 857, 82 L.Ed. 1282 (1938). The same principle applies in criminal cases. Davena v. United States, 9 Cir. 1952, 198 F.2d 230, 232, cert. denied, 344 U.S. 878, 73 S.Ct. 168, 97 L.Ed. 680 (1952). Defendants seek to avoid this rule, contending that Heider's original reporting method was improper because it did not clearly reflect income. They base their contention that Heider's method of reporting was improper on the authority of Liftin v. Commissioner, 36 T.C. 909 (1961), which was approved in Willhoit v. C. I. R., 9 Cir., 1962, 308 F.2d 259.

These cases, relied on by defendants, specifically distinguish between discount contracts which are highly speculative in nature and those which are not. It is proper to report income on contracts, other than highly speculative ones, ratably over their life.

▮ In many instances, at the time he purchased a contract, Heider received either a title or a mortgage on the real property to which the contract pertained. During the prosecution years Heider chose to report his income on these contracts ratably over their life.

Since there is no evidence that any of the contracts were highly speculative, Heider's method of reporting during the prosecution years was proper and he is bound by his choice of that method. The Government has properly accounted for these contracts in the net worth schedules.

## CAPITAL LOSSES

Defendants contend that the Government erred in figuring ordinary losses as capital losses. They assert that proper treatment of these losses would decrease 1953 income by $1,040.10 and 1954 income by $2,774.12.

Heider often recovered property which he sold or financed. Defendants contend that these properties were voluntarily reconveyed to him. Therefore, they invoke Section 39.23(k)–3 of the Income Tax Regulations (1939 Code) [3] in support of their contention that any losses on these transactions were valid bad debts, entitling Heider to ordinary losses.

The Government maintains that these transactions were not voluntary reconveyances, but foreclosures and that I.T. 3159, 1938–1 CB 188, narrows the application of Section 39.23(k)–3 to those cases in which the taxpayer repurchased the property at less than the outstanding mortgage indebtedness. Heider appraised each property on recovery at the amount of the outstanding indebtedness.

▮ Heider's practice with respect to this type of transaction was unorthodox. When he financed sales of property, he would hold the title. When his debtors failed to meet their obligations, he would force them off the property or put them on rental status. Although Heider did not institute foreclosure proceedings, he ordinarily did not recover the property by a voluntary reconveyance. Therefore, ordinary loss treatment under Section 39.23(k)–3 is not available to him.

Although one transaction involving $1,003.26 appears to be a voluntary reconveyance, Heider's income is not affected

---

3. Now embodied in Income Tax Regulations (1954 Code) § 1.166–6(a) (1).

because this item was already reflected as a loss in the Government's calculations.

## BAD DEBTS

Under the loans receivable accounts— real estate and vehicular—defendants claim a reduction of $14,112.95 from closing net worth as bad debts which should have been, but were not written off. This would decrease 1954 income by the entire amount.

Section 166(a) of the Internal Revenue Code of 1954, 26 U.S.C.A. (I.R.C.1954) § 166(a), allows a total write-off of those debts becoming "worthless within the taxable year" and a partial write-off of debt "in an amount not in excess of the part charged off within the taxable year."

■ Since Heider did not charge off his books any portion of the amount he now claims as bad debts on December 31, 1954, he is not entitled to a partial write-off on any of the contracts. However, since there is no requirement under the 1954 Code that a wholly worthless debt be charged off a taxpayer's books within the taxable year, defendants argue that it is proper to write off at this time debts of Heider which were wholly worthless in 1954, even though overlooked by Heider at the time.

The Government does not seriously contest defendants' statement of the law. However, the Government maintains that these claimed bad debts were not bad, but were secured by collateral on December 31, 1954, and thus not wholly worthless on that date.

"In determining whether a debt is worthless in whole or in part the district director will consider all pertinent evidence, including the value of collateral, if any, securing the debt and the financial condition of the debtor." Section 1.166–2(a) Income Tax Regulations (1954 Code). Few of Heider's claimed bad debts qualify under this rule.

■ Of the $14,112.95 which defendants assert were bad debts on December 31, 1954, contracts representing $10,496.16 were secured by valuable and available collateral. There was much evidence that Heider often let debts ride several months without payment. In fact, he ultimately collected much of this $10,496.16.

Of the remaining $3,616.79, $832.05 was represented by a contract with an undated notation "paid and closed." If paid during 1954, Heider is not prejudiced by inclusion of that figure in the loans receivable account as it does not appear in his receipts for 1954. Defendants offer no evidence as to when the contract was closed. Therefore, I find that the Government properly included the figure in its closing balance.

■ There are three contracts totaling $2,784.74 on which there is no evidence of security or future satisfaction. It appears that these contracts were wholly worthless on December 31, 1954. For the basis of this case, I will assume that defendants' construction of Section 166(a) of the 1954 Code is correct, and allow a write-off in the amount of these contracts.

The Government's figures showing Heider's closing net worth and his 1954 income will be reduced by $2,784.74.

## DEPRECIABLE PROPERTY

Defendants claim that the Government's opening net worth statement should be increased by $3,489.80 and the closing net worth reduced by $1,955.63 because of mistakes in the tax bases and depreciation allowances on several pieces of property. This would reduce income for 1953 and 1954, respectively, by $753.23 and $4,692.20.

■ Heider purchased the Coblenz property, consisting of three acres of land and improvements for $3,500.00 in 1952. He assigned values of $400.00 to the land and $3,100.00 to the four buildings. Of the total value of the land and buildings, the County Assessor in 1951 assigned 61 per cent to the land. The buildings were in such a bad state of repair as to be uninsurable. Three were destroyed in 1952. The fourth building was torn down by Heider in 1954. The Government contends that $1,365.00 is the highest value that should have been

assigned to the buildings. This would leave $2,135.00 attributable to land. The Government's reduction in value of the buildings from $3,100.00 to $1,365.00 reduced by $408.47 the value that Heider had assigned to the fourth building. It also reduced by the same amount the loss which Heider could take when he destroyed that building in 1954. This in turn increased his 1954 income by $408.47. In addition, by raising the basis in the land to $2,135.00, the Government increased Heider's closing net worth and therefore his 1954 income by $1,735.00.

Heider's allocation between land and improvements has no rational basis. The Government's allocation of $1,365.00 to the buildings, in view of all the circumstances, was generous. The Government sustained its burden of proof as to the figures it used.

 Heider's tax returns for the years 1952, 1953, and 1954 show the cost of the Remington-Appling house as $5,900.00. The Government asserts that the property cost only $2,900.00. Defendants contend that the Government erred in not using $5,900.00, which would reduce Heider's income in 1953 by $3,000.00 plus $81.33 in additional depreciation. The house was sold to Appling in 1954 for $2,000.00. The Government relies on Heider's own penciled notation on the contract of sale to Appling, which reads: "place cost $2,900.00, actual loss $900." The evidence clearly shows that Heider did not rely on his business records and tax returns which were often inaccurate and false, but did rely on his contracts which were either in Miss Lawrence's or his exclusive control. Defendants introduced no evidence other than the tax returns. Here again the Government sustained its burden of proof on the value of the Remington-Appling house.

Defendants' claim for a depreciation allowance of $220.63 on the Van Vleck property should be allowed. This would reduce December 31, 1953, net worth and thus 1953 income by that amount.

The result of proof on these issues reduces 1953 income by $220.63.

## CONCLUSION

 The Government's latest claim is that Heider's unreported taxable income was $5,999.70 in 1953 and $97,046.95 in 1954. My determination of the disputed items requires a reduction of these amounts by $4,446.32 in 1953 and $5,976.80 in 1954. I therefore find that defendants Heider and Lawrence wilfully attempted to evade income taxes on Heider's income of $1,553.38 in 1953 and $91,070.15 in 1954.

At the conclusion of the trial, I indicated a greater interest in Heider's 1954 income because the Government claimed a large unreported income for that year. The amount of unreported income which the Government claimed for 1953 was $5,999.70 and the amount proved was $1,553.38. Some authorities indicate that the Government must prove a substantial amount of unreported income in order to constitute a violation of Section 145(b) of the Internal Revenue Code of 1939, 53 Stat. 63, 26 U.S.C.A. (I.R.C. 1939) § 145(b), now embodied in Section 7201 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 7201. Fischer v. United States, 10 Cir. 1954, 212 F.2d 441, United States v. Johnson, 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546 (1943).

 In view of Heider's large receipts and disbursements during the year 1953, was the amount of unreported income substantial? Heider in his 1953 return reported a net loss of $92,937.05. Such a loss could have been used as a carry-back or carry-forward to offset prior or subsequent income. Heider did use a portion of this reported loss to wipe out the $18,467.82 income which he reported in 1954.

The proof showed beyond any doubt that the defendants attempted to cheat the Government by wilfully understating Heider's net income. The Government concedes that in order to find the defendants guilty, I must find that Heider owed a tax.

 In my view, if a taxpayer reports a large loss when he has a net taxable income which he wilfully failed to

divulge, he is guilty of a violation of the income tax law[4] even though the amount of his net taxable income is comparatively small. United States v. Nunan, 2 Cir. 1956, 236 F.2d 576, 585.

I find the defendants guilty of the crimes charged in Counts I and II of the indictment.

---

4. Section 145(b), Internal Revenue Code of 1939.