WINGATE E. UNDERHILL AND MATTIE R. UNDERHILL, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 713–64. Filed February 28, 1966.

Wingate E. Underhill, pro se.
*Eugene I. Meyers*, for the respondent.

TANNENWALD, *Judge:* The respondent determined a deficiency in petitioners' income taxes for the year 1961 in the amount of $1,777.47.

There are two questions presented. The first involves a determination of the proper basis for reporting discount income by a cash basis taxpayer who has purchased debt obligations at less than the unpaid principal balance of the obligation at the time of acquisition. The second involves a determination whether, if the cost recovery basis is held to be proper, petitioner is precluded from utilizing such basis by section 446(e),[1] where prior to the taxable year involved he has in fact reported on the prorata basis.[2]

FINDINGS OF FACT

Some of the facts in this case have been stipulated. The stipulation and the exhibits attached thereto are incorporated herein and made a part of our findings of fact by this reference.

Wingate E. and Mattie R. Underhill are husband and wife residing in Washington, D.C. They filed a joint Federal income tax return for the calendar year 1961 on a cash basis with the district director of internal revenue, Baltimore, Md. All references herein to petitioner shall refer to Wingate E. Underhill, his wife being a party to this proceeding solely as a result of her having executed the joint return.

---

[1] Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended.

[2] The "cost recovery" basis permits the taxpayer to recover his cost before reporting any discount income. The "prorata" basis requires the taxpayer to report as discount income the part of each payment which equals the ratio of the discount at which he purchased the obligation to the unpaid principal balance of such obligation at the time of the acquisition. The rest of the payment under the latter basis is applied against his cost.

Petitioner is an employee of the U.S. Department of Agriculture. In 1947 petitioner began acquiring interest-bearing obligations (usually negotiable promissory notes, hereinafter sometimes referred to as notes) and has continued his acquisition of such obligations up to the present. During the years 1947 through 1961 (the taxable year involved herein), obligations acquired by petitioner were purchased at a discount from the principal amount owing at the date of acquisition. Generally the security for such obligations was second deeds of trust on residential property, although some involved security of first trusts on chattels, some first and third deeds of trust on residential property, and one a second deed of trust on vacant land. In 1949 petitioner owned 10 notes; in 1951, 20 notes; in 1954, 40 notes; in 1958, 46 notes; and in 1961 he owned 50 notes, some of which were closed out during the year.

Petitioner purchased the obligations from many sources including "broker-speculators," i.e., licensed brokers, who bought property for the purpose of resale, taking back a trust note and immediately selling the note; "vendors," who were property owners who sold their property, taking back a trust note from the purchaser, which they sold; "speculators," who followed the same pattern as the broker-speculators, except that they were not licensed as brokers; "contractors," who performed services by making improvements on property, for which they received a trust note which they sold; "investors," who purchased notes to hold but sold when they needed money; "brokers," who were licensed real estate brokers and who sold notes on behalf of vendors; and "note brokers," who purchased notes with the purpose of making an immediate resale at a profit. Usually the original debtor was personally obligated on the note and sometimes the person from whom petitioner acquired the note affixed his endorsement and was also personally obligated thereon. Occasionally petitioner made a direct loan taking back the obligation of the borrower.

Of the 50 notes owned by the petitioner in 1961, 42 were secured by deeds of trust on real estate (41 of which were on residential property and one on vacant land). Of these 42 notes, 2 were secured by first deeds of trust, 33 by second deeds of trust, and 7 by third deeds of trust. Four notes were secured by operating businesses, of which 3 were secured by specific chattels and 1 was unsecured. These 4 notes were acquired by petitioner as a result of furnishing additional funds to operators of businesses whose other notes petitioner already held.

All 50 notes were acquired at a discount. Often the amount paid by petitioner was more than the equity in the property, i.e., the value of the property in excess of the amount of the then-existing prior liens. The notes provided for interest to be paid by the borrower, usually at the rate of 6 percent, and for repayment of the unpaid balances at the time of acquisition in installments over varying periods of years.

During the period from 1947 through 1961, petitioner closed out 99 separate notes, of which 5 were closed out in 1961. The 99 notes had unpaid balances at the time of acquisition totaling $206,000 and were acquired by petitioner at a weighted average discount of approximately 27 percent, or $146,300. The weighted average discount of the 50 notes owned by petitioner in 1961 was approximately 35½ percent.

Of the $206,000 principal of the 99 notes closed out, petitioner collected all but $8,500. Petitioner received payment in full on 68 of the 99 notes. With respect to 1 note, petitioner recovered less than his cost. On 14 notes petitioner gave "courtesy" discounts, which are normally given if the borrower pays off the principal in advance. These discounts totaled $564.63. As to the other 16 notes, some were paid at relatively small discounts because petitioner thought it was in his best interest to accept less than the full amount.

Petitioner did not know in advance which notes would actually give him trouble in collection thereof. There was a limited market for the sale of obligations of the type acquired by petitioner. However, petitioner only occasionally offered obligations owned by him for sale, being primarily interested in acquiring and holding them for investment purposes.

Petitioner, in deciding whether or not to buy a given note, considered such things as the occupation and place of employment of the borrower, credit report of the borrower, amount of downpayment, location of the property, and the amount and terms of payment of prior liens. If the note had been held by its seller for any length of time, as occasionally happened, petitioner considered the regularity of payment by the borrower.

Petitioner spent approximately 12 to 15 hours per week in connection with the management of the obligations. Petitioner worked very closely with the debtors in attempting to avoid foreclosures on the property. He would help debtors who failed to keep their payments current by finding buyers for their houses, advancing funds for payments on obligations senior to his, and helping debtors who had lost their jobs find new ones. During the period 1947 to 1961, petitioner brought only one foreclosure proceeding.

Over the past 10 to 15 years real estate prices have been rising with respect to the types of property which for the most part secured obligations of the type owned by petitioner.

Petitioner has kept a complete set of books and records at all times with respect to his note activities.

Prior to the year at issue, petitioner did not report discount income for Federal income tax purposes on a cost recovery basis, but rather reported it on a prorata basis. Petitioner changed to the cost recovery basis for 1961 on the strength of *Phillips* v. *Frank*, 295 F. 2d 629 (C.A.

9, 1961). Petitioner did not seek nor did he receive the consent of the Secretary of the Treasury or his delegate to this change.

Petitioner on his 1961 return reported the amount of $9,282.48 as "Interest and Discount" income, of which he reported $6,183.16 as "interest" income and $3,099.32 as "earned discount" income. Respondent does not question the $6,183.16 interest income but in his deficiency notice determined that petitioner understated his earned discount income by $4,837.07.

OPINION

The first issue in this case is simple to state: Should a cash basis taxpayer, who acquires interest-bearing obligations at a discount from the unpaid principal balance at the time of acquisition, defer the inclusion in income of all payments on account of principal until he has recovered his cost, or should he include in income a prorata portion of each such payment? [3]

The determinative factor, as petitioner and respondent agree, is whether the obligations are "speculative," in which event the cost recovery basis is proper, or "nonspeculative," in which event the taxpayer is required to use the prorata basis of reporting the payments. To make such a determination, we perforce must enter the occult realm of lexicology, recognizing, as Alice in Wonderland did, that words can mean many different things. See Carroll, Through the Looking-Glass 124 (Macmillan & Co., New York, 1892). Our task is to try to introduce "some certitude in a landscape of shifting sands." See *United States* v. *Rhode Island Hospital Trust Co.*, 355 F. 2d 7 (C.A. 1, 1966).

Before proceeding to this task, it is important to note that this case does not involve a situation where the amount of the obligation cannot be calculated with any degree of certainty or where the taxpayer's right to receive payment of the obligation is conditional. In such situations, the courts have usually held that the taxpayer should be allowed to recover his cost before reporting any payments as taxable income. See, e.g., *Burnet* v. *Logan*, 283 U.S. 404 (1931). In the instant case, the amount required to be paid by the obligor is fixed and the obligation to pay is not subject to a prior condition. Since the taxpayer's cost is also known, the amount of his potential profit—i.e., the discount—is clearly ascertainable.

---

[3] There is no issue as to the taxability of the interest payments to petitioner. Moreover, we are not here concerned (a) with a situation where the obligation is noninterest-bearing and the discount can be found, at least in part, to be a substitute for interest; (b) with determining whether the taxpayer has received fixed obligations which are sufficiently capable of being valued as to produce an immediate recognition of gain at the time of acquisition, e.g., *Nina J. Ennis*, 17 T. C. 465 (1951); (c) with whether income attributable to the discount should be properly treated as capital gain or ordinary income, e.g., *A. B. Culbertson*, 14 T.C. 1421 (1950).

Basic to our approach is the fact that our Federal income tax system is predicated upon the theory of annual accounting periods. A taxpayer must compute his taxable income on the basis of such periods; his calculation of gain, and liability for tax thereon, cannot always abide the events which would assure him overall gain or loss. Sec. 441; see *Burnet* v. *Sanford & Brooks Co.*, 282 U.S. 359, 363–365 (1931). Against this background, we conclude that a heavy burden falls upon the taxpayer to show that the obligations owned by him are "speculative" and that consequently the cost recovery basis of reporting is proper. His burden in this regard can be likened to that of the taxpayer who seeks to take himself out of the normal rules governing useful life for the purpose of depreciation. E.g., *Copifyer Lithograph Corporation*, 12 T.C. 728 (1949).

The earliest case dealing with the issue involved herein is *Shafpa Realty Corporation*, 8 B.T.A. 283 (1927), where we held that the original holder of a second mortgage, whose cost was less than face value, was required to prorate part payments received in subsequent years between principal and income in the ratio of the discounted value at the time of acquisition to the face amount of the obligation. In so holding we stated: "It is no more correct to say that the part payment was all a return of principal than it is to say that it was all a return of income." *Id.* at 284. This principle is the key to all of the decisions which have followed.

While the rationale of the decided cases may not be crystal clear,[4] we think the standards for determining whether an obligation is speculative can be delineated with "some certitude." Initially it is obvious that we cannot find, as petitioner suggests, that second mortgages are speculative per se. Petitioner would have us withdraw into an ivory tower, ignore the economic realities of the marketplace, and make all the assumptions in his favor. This we will not do. We think there is always a risk of failure to receive full payment of an obligation, regardless of the nature or extent of the underlying security; insofar as this risk is within the realm of normal business expectancy and does not involve unusual conditions, the obligation cannot be found to be speculative. Neither ordinary optimism nor ordinary pessimism can be the touchstone.

A careful examination of the decided cases, practically all of which are set forth in respondent's excellent brief, reveals the following elements which are taken into account in determining whether a particular obligation is speculative:

---

[4] The respondent is not entirely blameless for the lack of clarity. He has not hesitated to argue for the cost recovery method when it has suited his purposes of the moment. See *Hatch* v. *Commissioner*, 190 F. 2d 254 (C.A. 2, 1951), reversing and remanding 14 T.C. 237 (1950) ; *Victor B. Gilbert*, 6 T.C. 10 (1946).

(1) The existence of personal liability of the debtor and/or a guarantor or endorser and his credit standing, resources, and other special factors bearing on his financial responsibility. *Phillips* v. *Frank,* 295 F. 2d 629 (C.A. 9, 1961); *Morton Liftin,* 36 T.C. 909 (1961), affd. 317 F. 2d 234 (C.A. 4, 1963); see *Hatch* v. *Commissioner,* 190 F. 2d 254, 257 (C.A. 2, 1951), reversing and remanding 14 T.C. 237 (1950).

(2) The marketability of the obligation, which involves the subsidiary consideration of its negotiability. *Phillips* v. *Frank, supra; Darby Investment Corporation* v. *Commissioner,* 315 F. 2d 551 (C.A. 6, 1953), affirming 37 T.C. 839 (1962); *Walter H. Potter,* 44 T.C. 159 (1965), on appeal (C.A. 9, Oct. 4, 1965). We note that, in the context with which we are dealing, marketability and fair market value are not necessarily synonymous. Quite obviously, a purchaser at a discount, in an arm's-length transaction, does pay for the obligation and, therefore, the argument can be made that it has a fair market value at least equal to the amount paid. But this does not mean that a purchaser can necessarily resell even a negotiable obligation—i.e., whether or not it is marketable by him.

(3) Whether or not, at the time of acquisition, the obligor is in substantial default on payments due. *Phillips* v. *Frank, supra;* see also *Willhoit* v. *Commissioner,* 308 F. 2d 259 (C.A. 9, 1962), reversing a Memorandum Opinion of this Court, where the court found that the taxpayer undertook a "hazardous salvage operation."

(4) The terms of payment and the extent and nature of the security for the obligation, if any,[5] at the time of acquisition—i.e., whether a first, second, or other prior lien—and the character, condition, and the then-market value of the underlying property. *Darby Investment Corporation* v. *Commissioner, supra; Harris Trust & Savings Bank, Executor,* 24 B.T.A. 498 (1931).

(5) The size of the discount. While the existence of a discount obviously does not per se make the obligations speculative, the extent of the discount does have a bearing. *Morton Liftin, supra.*

Respondent has suggested that a further element be considered—namely, the astuteness of the particular purchaser and his assiduousness as revealed by the success he has had in avoiding foreclosures and in helping his obligors to make their required payments. The determination of whether an obligation is speculative should not be personalized by reference to the business acumen of the purchaser. To do so would produce the curious result of favoring—at least by respond-

---

[5] It does not follow that the absence of security will necessarily require a finding that the obligation is speculative. Cf. *Hatch* v. *Commissioner, supra.*

ent's standards—the less diligent taxpayer. It does not follow that astuteness or assiduousness produces less likelihood of loss; even an investor having such qualities may be taking a gamble.

Of course, the foregoing elements are merely the threads which, when woven together, constitute the fabric of the ultimate test for determining whether a particular obligation is "speculative." Prior decisions have not been required to focus on the precise limits of the ultimate test to be applied.[6] We hold that the ultimate test is whether, at the time of acquisition,[7] the person acquiring the obligation (whether by purchase or otherwise) cannot be reasonably certain that he will recover his cost *and* a major portion of the discount. We believe it is not essential to the ultimate test that the major portion of the discount, which may be reasonably certain to be recovered, be determined precisely. It should be sufficient to make a broad finding in this regard. If the obligation is found to be nonspeculative, the taxpayer would then be required to report the payments pro rata based upon the total discount.

Petitioner argues that the facts of his situation are substantially identical with those in *Liftin* and that consequently we should apply the above elements as we did in *Liftin* and conclude that the obligations herein are speculative.[8] While the evidence herein is not completely satisfactory, we are constrained, in light of the particular facts of this case, to agree with petitioner and, accordingly, except to the extent noted below, we find the obligations, in fact, speculative.[9]

The exceptions involve the obligations described as Jablonski #1, Hodges, #1, 2, 3, and 4, Henry, Menghi, and E. J. Restaurant, Inc. Here the petitioner has not succeeded in convincing us that these notes were speculative. Accordingly, we find that they were in fact not speculative and that, consequently, petitioner is not entitled to post-

---

[6] Compare *Willhoit* v. *Commissioner*, 308 F. 2d 259, 263 (C.A. 9, 1962), reversing a Memorandum Opinion of this Court, and *Morton Liftin*, 36 T.C. 909, 911 (1961), affd. 317 F. 2d 234 (C.A. 4, 1963), suggesting a possible test of doubt whether the contract will be completely carried out, with *Darby Investment Corporation* v. *Commissioner*, 315 F. 2d 551, 552 (C.A. 6, 1953), affirming 37 T.C. 839 (1962); *Walter H. Potter*, 44 T.C. 159, 178 (1965), on appeal (C.A. 9, Oct. 4, 1965) ; and *Inter-City Television Film Corp.*, 43 T.C. 270, 292–293 (1964), suggesting a possible test of reasonable certainty of merely recovering cost.

[7] We believe that considerations of orderly administration of the tax laws dictate that the determination be made at the time of acquisition rather than each year during which the obligation is held, although we recognize that there may be rare cases in which, because of additions to cost in a subsequent year, a redetermination may have to be made at that time.

[8] Petitioner has not only conformed his proof to the *Liftin* mold but has also obviously taken into account the fact that his appeal from an adverse decision would be heard by the Fourth Circuit Court of Appeals, the same court which decided *Liftin*.

[9] With respect to the Jablonski #3, Medford, and Washington notes, as we understand it, respondent has conceded that they were speculative, but, even if our understanding is incorrect, these obligations were, in fact, speculative and we so find.

pone reporting any portion of the payments thereon until he has recovered his cost.[10]

Having found that petitioner should report some discount income on the cost recovery basis, we turn to the second issue in this case. Respondent argues that petitioner's reporting on the cost recovery basis in 1961, after reporting on the prorata basis in prior years, constitutes a change in the method of his accounting within the meaning of section 446(e).[11] Petitioner counters this argument with the assertion that he has not changed his method of accounting but has merely conformed his reporting to the decisions dealing with obligations similar to his.

Section 446(e) prohibits taxpayers from changing their method of accounting without obtaining the prior consent of respondent. Section 1.446-1(e)(2), Income Tax Regs., provides that consent must be secured whether or not a taxpayer regards the *method* from which he desires to change to be proper. Thus, respondent asserts that anyone trying to correct an erorr in a method of accounting must first get his consent.

Critical to respondent's position is a determination that the situation involves a "method of accounting"—a phrase which, at times, appears to have certain chameleon qualities. Cf. *Fruehauf Trailer Co.*, 42 T.C. 83, 103-104 (1964), on taxpayer's appeal to C.A. 6 (Oct. 22, 1964). Whatever may be the subtleties of a "method of accounting" (see Falk, "Definition of Accounting Method: Reevaluation in Light of American Can Company and Other Recent Decisions," 23d Ann. N.Y.U. Tax Inst. 787 (1965)), we do not think that they concern us in the instant situation. The issue before us is the extent to which payments received by petitioner are taxable or nontaxable—i.e., the character of the payment—not the proper method or time of reporting an item the character of which is not in question. Petitioner should no more be precluded from reporting his payments on the correct basis than a taxpayer who has previously been reporting nontaxable income as taxable income would be required to continue to do so because of his prior error. Moreover, as to the obligations which

---

[10] Jablonski #1 and E. J. Restaurant, Inc., were secured by first chattel trusts. Henry was secured by a first trust on realty and there is no evidence that the fact that the mortgagor only owned a one-fifth interest in the property materially affected the security. Menghi was also a first trust on realty; the effect of an alleged encroachment on the adjoining property was not shown. Hodges #1 and #2 were, in effect, combined and, as a consequence, secured by a first chattel trust. Hodges #3 was unsecured, but very small in amount (and with a very small discount), and there was no evidence as to the financial responsibility of the debtor. Hodges #4 was secured by a first chattel trust. On three of these obligations the discount was less than 15 percent, on two less than 25 percent, and on one less than 30 percent.

[11] Respondent confines his argument to petitioner's reporting of discount income on speculative obligations acquired by petitioner prior to 1961, the taxable year involved herein. He does not question petitioner's right to report on the cost recovery basis with respect to speculative obligations acquired during 1961.

have been held to be speculative, petitioner reported an excess amount of income in the years prior to 1961 by including a prorata portion of the payments received in those years. We are not persuaded that this case involves a situation where the respondent's consent to a change of reporting should be required under section 446(e) to insure that there will not be a distortion of income "to the detriment of the Government." See *Commissioner* v. *O. Liquidating Corporation*, 292 F. 2d 225, 230 (C.A. 3, 1961), reversing a Memorandum Opinion of this Court, certiorari denied 368 U.S. 898 (1961).

Petitioner had no choice in determining whether an obligation was speculative or nonspeculative, nor was there any doubt or choice about the method or time of reporting income once that determination was made. For the reasons stated, the decisions relied upon by respondent (*American Can Co.* v. *Commissioner*, 317 F. 2d 604 (C.A. 2, 1963), affirming in part and reversing in part 37 T.C. 198 (1961), certiorari denied 375 U.S. 993 (1964); *Commissioner* v. *O. Liquidating Corporation, supra;* and *Lord* v. *United States*, 296 F. 2d 333 (C.A. 9, 1961)) are clearly distinguishable.[12] This case falls within the ambit of *Thompson-King-Tate, Inc.* v. *United States*, 296 F. 2d 290 (C.A. 6, 1961); *Beacon Publishing Co.* v. *Commissioner*, 218 F. 2d 697 (C.A. 10, 1955), reversing 21 T.C. 610 (1954); *Ross* v. *Commissioner*, 169 F. 2d 483 (C.A. 1, 1948), reversing a Memorandum Opinion of this Court; and *North Carolina Granite Corp.*, 43 T.C. 149 (1964).

*Decision will be entered under Rule 50.*

---

[12] Respondent also relies on the use of the phrase "method of accounting" in *Willhoit* v. *Commissioner, supra,* and *Walter H. Potter, supra*. In neither of these cases was the applicability of sec. 446(e) involved with respect to the issue of cost recovery versus prorata basis of reporting. As a result, the language had merely descriptive and not substantive significance. *United States* v. *Heider,* 231 F. Supp. 223 (D. Ore. 1964), also relied upon by respondent, merely held that the prorata basis of reporting discount (utilized by the taxpayer) was correct.