HERBERT S. WITTE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Witte v. Commissioner
Docket No. 829-68.
United States Tax Court
T.C. Memo 1972-232; 1972 Tax Ct. Memo LEXIS 26; 31 T.C.M. (CCH) 1137; T.C.M. (RIA) 72232; November 20, 1972, Filed *26 Robert H. Wyshak and Lillian Wyshak, for the petitioner. Allan Hill, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's Federal income taxes in the following years and amounts: Calendar
year
Amount
1962
$15,352.35
1963
7,862.25
1964
6,875.03
Some of the issues raised in the pleadings have been disposed of by concessions of the parties, leaving for our decision the following: (1) To what extent are amounts received by petitioner in the years here in issue as collections of principal and interest under contracts for the sale of real property entered into in 1956 and 1957 includable in his taxable income. (2) Is petitioner subject to self-employment tax under section 1401, I.R.C. 1954, [1] in the years here in issue. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Herbert S. Witte, hereinafter referred to as petitioner, resided in Genova, Italy, at the time of the filing of the petition herein. Petitioner filed individual Federal income tax returns for the calendar years 1962, 1963, and 1964 with the director of internal revenue, *27 Office of International Operations, Washington, D.C.
Robert C. Monroe, hereinafter referred to as Monroe, was in 1956 and 1957 and for some years prior thereto, an investment broker with the firm of Hill, Richards and Company. In 1956 and 1957 and in some prior years, Monroe had represented petitioner in the investment in securities. In 1956, petitioner and Monroe entered into a business venture involving the acquisition of unimproved real property in the Antelope Vally in California. Under an oral agreement between petitioner and Monroe, petitioner was to advance the money needed to purchase certain real property and the profits, if any, from the disposition of that property were to be shared equally by petitioner and Monroe with a reduction in Monroe's share by an allowance for interest at 6 percent per annum on the sums advanced by petitioner for the purchase of the property. During the calendar years 1956 and 1957, petitioner advanced the funds to purchase five parcels of real property. The parcels, all of which were located in Kern County, California, were purchased on the dates shown, with the name in which title was taken and the description of the property, in the following *28 list: Title taken
Date title
in name of
Description of property
was acquired
Herbert S. Witte and
The north half of Section 24,
October 17, 1956
Robert C. Monroe
Township 11 North, Range 12
West
Herbert S. Witte
The west half of the southwest
January 16, 1957
quarter of section 10,
Township 9 North, Range 13 West
Herbert S. Witte and
The east half of the northwest
August 29, 1956
Robert C. Monroe
quarter of Section 8, Township
9 North, Range 13 West
Herbert S. Witte
The north one-half and the
April 2, 1957
south one-half of the south-
west quarter of Section 32
Township 11 North, Range 13
West
Herbert S. Witte and
The south half of Section 17,
October 9, 1956
Robert C. Monroe
Township 11 North, Range 11
West The five parcels purchased had a total area of approximately 960 acres. A subdivision map was filed in the County Recorder's Office of Kern County, Bakersfield, California only with respect to the parcel acquired on August 29, 1956. The remaining parcels were subdivided but no subdivision maps were filed with the County Recorder's Office of Kern County. Monroe had been informed by an employee of that office that the properties involved were not under the jurisdiction of the County Recorder's office. Monroe sought *29 to sell the subdivided parcels of property to acquaintances he had made through his occupation as an investment broker. The details of the sales efforts were left up to Monroe but petitioner was made aware of the selling prices and signed the agreements entered into for the sale of the subdivided parcels of real property. During the calendar years 1956 and 1957 portions of the real property purchased by petitioner and Monroe were sold. The sales contracts were all in the same form. Each contract provided for a 10 percent downpayment and principal and interest payments of 1 percent of the sales price per month until the balance of the purchase price was paid. The following schedule shows the portions sold, indicating the section from which it came, the name of the purchaser, and the date of the sales agreement: Original parcel
Date of
section number
Name of purchaser
sales agreement
Section 24
T. C. Cook
January 15, 1957
Section 24
R. H. Gallagher
January 2, 1957
Section 24
Leo Hall
December 31, 1956
Section 24
Frances S. Osborne
February 20, 1957
Section 24
J. Bradley Crundwell
January 15, 1957
Section 24
Warren C. Johnston
February 10, 1957
Section 24
Raymond N. & Fred
January 15, 1957
D. Gibbs
Section 24
Claude Grow and
January 10, 1957
William J. McMasters
Section 24
Richard L. Kasper and
January 23, 1957
P. L. Klassen
Section 24
Alfred C. and Doras
April 19, 1957
Ellen Prescott
Section 17
Ray N. Gibbs
March 18, 1957
Section 17
E. Bernard and
June 4, 1957
Marie D. Moran
Section 17
Frank W. and Helen D.
June 10, 1957
Turnbull
Section 17
Robert C. and Mary Alice
June 21, 1957
Monroe
Section 8
G. H. Greene
September 10, 1956
Section 8
Alan R. and Jack E.
September 12, 1956
Gilberts
Section 8
Dan and Mel Bartfield
September 11, 1956
Section 10
Herbert M. Woertz
March 19, 1959[ sic ]
Section 10
E. Bernard and Marie
March 28, 1957
D. Moran
Section 10
Milo S. and Nancy L.
April 13, 1957
Morgan
Section 10
Richard L. Kasper and
April 12, 1957
P. L. Klassen
Section 10
Frances S. Osborne
March 21, 1957
Section 10
Richard B. Taylor
May 2, 1957
Section 10
Melba Moore
April 30, 1957
Section 32
John P. Smith and
June 13, 1957
J. Harley Quint
Section 32
Hal C. Weed
April 19, 1957
Section 32
O. Warren Hillgren
April 19, 1957
Section 32
William C. Roberts
August 28, 1957
Section 24
William P. Zuehlke
February 6, 1957l6Section 24
William P. Zuehlke
January 21, 1957
*30 Each of the parcels of land sold was approximately 20 acres. All of the persons to whom sales were made were acquaintances of monroe. All of them were engaged in a business or profession and were considered by Monroe to be of substantial financial means. Each sales contract contained an unconditional promise by the purchaser to pay the full purchase price and provided for interest at the rate of 6 percent per annum on the unpaid principal amount. Under the sales contract, each purchaser agreed to pay all assessments, taxes, or charges of any kind levied on the parcel purchased. The contract provided for possession of the premises by the buyer and delivery of a deed when the obligation under the contract had been paid in full. The agreement further provided that upon default in a payment, the total balance would become due, and if not paid upon demand that upon service by the seller upon the buyer of a written declaration of default, forfeiture and cancellation, unless payment in full were made, all the buyer's rights and interest in the property should revert to and vest in the seller. The contract used by petitioner and Monroe in making the sales in 1956 and 1957 was in a form customarily *31 used in the Los Angeles and Kern County, California area. There was a market for such land sales contracts in 1956 and 1957 and subsequent years. Such contracts were bought and sold at discounts ranging from 25 to 50 percent off their face amount, the discount depending primarily on the value of the underlying property and the financial standing of the buyer. In March 1958 petitioner and Monroe severed their business relationship. Petitioner paid Monroe an agreed amount and ownership of the entire interest in the remaining property was transferred to petitioner. In 1960 petitioner, because he was planning to move to Italy, entered into an agreement with the Western Mutual Escrow Corporation, Alhambra, California (hereinafter referred to as Western) under which Western agreed to collect monthly installments on the land sales contracts owned by petitioner. After 1960 petitioner lived in Italy except for trips of a few months to other countries. Western maintained ledger cards reflecting receipts from purchasers and disbursements to petitioner. Western deducted a 50 cent fee for each collection made by it and placed the balance of each payment in petitioner's account. In 1962 petitioner *32 sold a portion of one of the remaining parcels of land to the State of California for highway use. Western who was contacted by the State of California with respect to this property and acting as petitioner's agent, negotiated and consummated the sale of the property while petitioner was in Italy. Petitioner had purchased the parcel in 1956. The property had a cost basis to petitioner of $962 and was sold to the State of California for $7,911. [2] Between 1960 and 1964 petitioner sold no part of the real property here involved except that sold to the State of California. Petitioner during the years 1956 and 1957 and the years here in issue and for all other years for which he filed income tax returns kept his books and records and filed his Federal income tax returns on the cash receipts and disbursements method of accounting. Petitioner did not make an election to report the receipts he received from the real property on an installment basis. Petitioner commenced reporting income received from the sale of the real property *33 only after he had recovered his costs in the property involved. Petitioner included in his cost recovery amounts paid as interest under the sales agreement and did not report such amounts currently as interest. After petitioner had recovered his entire cost in each parcel from the payments made under the sales agreements, he reported in his Federal income tax returns for each of the years here in issue the total payments received in such year as long-term capital gain, except that when petitioner gave a deed to the purchaser and either received a cash payment or took a note for the unpaid balance secured by a deed of trust, he reported the balance of the purchase price as long-term capital gain, and thereafter reported interest payments on the note as ordinary interest income. In 1962 petitioner reported the balance of the principal as long-term capital gain with respect to four pieces of property which he deeded to the purchasers; in 1963 he so reported with respect to six such pieces of property; and in 1963, with respect to seven such pieces of property. Respondent in his notice of deficiency determined that the receipts from the land transactions were not capital gains but were *34 partly interest income and partly ordinary business income and explained his adjustment as follows: [3]
It is determined that the gains reported on your returns for the years 1962, 1963 and 1964, as long-term capital gains resulting from the sales of real property, are comprised of interest income and gains from the sales of properties which are not capital assets as listed below. Adjustments for interest income and ordinary business income are made accordingly. For capital gain adjustment see adjustment (e) below. Gains from sales of land
Ordinary business
reported as long-term
Interest
income from sales
Year
capital gains
income
of land
1962
$35,832.00
$6,355.01
$29,476.99
1963
28,129.00
4,553.03
23,575.97
1964
24,483.00
2,737.18
21,745.82 OPINION Petitioner's primary position *35 in this case is that the sales of land which he and Monroe made in 1956 and 1957 were completed sales in those years and that the gain from such sales was properly reportable able in those years. Petitioner states that he received on the sales of the land in 1956 and 1957 cash plus the fair market value of land contracts. He states that he should have reported the gain on the sales in 1956 and 1957 and that for the years here in issue he should have reported the interest received on these contracts as ordinary income and that the principal payments should have been reported partly as a return of capital and partly as income on the basis of the percent the fair market value of the land sales contracts bore to the face value of the contracts at the time petitioner received the contracts in 1956 and 1957. It is petitioner's position that the land contracts in 1956 and 1957 each had a fair market value of 75 percent of its face value and that therefore in the years here in issue petitioner should have considered 75 percent of each principal payment as a return of principal and 25 percent as income. Without precisely so stating petitioner apparently concedes that the 25 percent of each *36 payment of principal would constitute ordinary income. It is petitioner's position that he overstated his income in each of the years here in issue with respect to the parcels of land deeded to the purchasers in return for a note secured by a trust deed. Petitioner contends that these transactions should not have been reported as if the land contract had been paid off in its entirety but rather the payments made by the purchasers on the notes should have been reported as if they were payments of principal and interest on the land contracts. Respondent agrees that petitioner should have reported his income in 1956 and 1957 by considering the land sales made in those years as completed and that his gain on the sales in those years should have been determined by subtracting petitioner's basis in each parcel of land from the amount of cash petitioner received on the sale plus the fair market value of the land contract at the time the contract was received. Respondent argues, however, that since petitioner did report the transactions under a "cost recovery" method of accounting in 1956 and 1957 and subsequent years, he is not entitled under section 446 to change his method without the consent *37 of the Commissioner. Petitioner has not requested or obtained the consent of the Commissioner to such a change. Respondent contends that petitioner's income reported on a "cost recovery" method is ordinary income since petitioner during1956 and 1957 was engaged in the trade or business of selling real estate. Respondent contends that petitioner is required to pay the selfemployment tax since his income in the years here in issue constituted earnings from the trade or business he engaged in in 1956 and 1957 of selling real estate. Respondent further contends that if petitioner is not considered in substance to be changing his method of accounting by now attempting to report income in the years here in issue on a different basis from that he adopted in 1956 and 1957 and continued to use throughout the years here in issue, then the land contracts which petitioner obtained in 1956 and 1957 should be considered to have a fair market value in those years of their face value.[4] *38 Section 1001(a)[5] *39 provides for the determination of gain or loss from the sale or other disposition of property. Section 1001(b) provides that the amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property other than money received. Under the facts of the instant case, we conclude that the parties are correct in their contention that petitioner should have reported his income in 1956 and 1957 by considering the prices he received for the parcels of property sold in those years to be the cash he received from the sales plus the fair market value of the land sales contracts. The Ninth Circuit, to which an appeal would lie in this case, in affirming our decision in Floyd R. Clodfelter, 48 T.C. 694 (1967), pointed out that although the question of whether property has an ascertainable fair market value is one of fact, a conditional *40 sales contract with provisions comparable to the provisions in the contracts here involved, is "property" received which has a "fair market value" within the meaning of section 1001(b). Clodfelter v. Commissioner, 426 F. 2d 1391, 1395 (C.A. 9, 1970). We have held in other cases involving land sales contracts quite similar to those involved in this case that the contracts were "property" with a "fair market value" and that the gain from the sale of property under such a contract should be computed on the basis of considering the sales price of the property to be the cash received plus the fair market value of the land sales contracts. Howard H. Perelman, 41 T.C. 234 (1963), and Kaufman v. Commissioner, 372 F. 2d 789 (C.A. 4, 1966), affirming on this issue, remanding on another issue, a Memorandum Opinion of this Court. Our holding in this respect was affirmed by the Ninth Circuit in Heller Trust v. Commissioner, 382 F. 2d 675 (C.A. 9, 1967), affirming on this issue and reversing on another, a Memorandum Opinion of this Court. In our opinion the evidence in this case supports petitioner's position that each of the land contracts had a value of 75 percent of its face amount when it *41 was received in 1956 and 1957. The evidence shows that the parcels of land were each approximately 20 acres. Petitioner's expert witness considered the size of the parcels to be a factor increasing the value of the land contract since if a default occurred the parcels could be further divided for resale. The record shows the buyers all to be persons of substantial financial means and standing. In our view the record shows that each contract here involved would sell in 1956 and 1957 at the lowest going discount rate prevalent in the Los Angeles area for newly entered into land sales contracts, which this record shows to be 25 percent. We therefore hold that each of the land contracts was worth 75 percent of its face value when it was received by petitioner in 1956 or 1957. For the same reasons we conclude that the land contracts were worth 75 percent of their face value when entered into, we conclude that these contracts were all likely at the time they were entered into to be paid in full in accordance with their terms. These land contracts were not "speculative" investments of a type that the owner was unlikely to recover his basis. In a number of cases we have held that where an *42 evidence of indebtedness is purchased at a discount from its face, if the obligation is so "speculative" that it is unlikely the purchaser will recover his cost, the purchaser is not required to report any gain for income tax purposes until his cost of the investment has been recovered, but if the obligation is sufficiently "unspeculative" that recovery of cost by the purchaser is likely, the purchaser is required to include in his taxable income a pro rata portion of each payment as made as discount income. Darby Investment Corporation, 37 T.C. 839 (1962), affirmed 315 F. 2d 551 (C.A. 6, 1963), and Wingate E. Underhill, 45 T.C. 489 (1966). When a land sales contract with a fair market value less than its face value is received by a cash basis taxpayer as part of the sales price of property and is included in the sales price in computing gain on the sale in the year of sale at its fair market value, that taxpayer is required to report his income in the years in which he collects principal and interest on the contract in the same manner as a taxpayer who has purchased a land sales contract at a discount. See Kaufman v. Commissioner, supra.Therefore in the instant case petitioner's *43 income from collections of principal on the land installment contracts should properly be allocated 75 percent to return of investment and 25 percent to ordinary income, representing a pro rata receipt of discount from face value in the year of receipt of the land sales contracts. Respondent, however, urges that even though petitioner improperly reported his income from his receipt of payments on the land sales contracts in the years here in issue, he should not be permitted to change his method of accounting since he did not secure respondent's consent as required by section 446(e).[6] *45 Respondent states that the fact that petitioner elected an improper method of reporting his gain from land sales does not justify now allowing him to repudiate his election to report his gain on a "cost recovery" basis, since the years in which he claims his income was properly reportable by including the fair market value of the land sales contract in computing his gain on the sale of the property are now barred by the statute of limitations. In Wingate E. Underhill, supra, (45 T.C. at 496-497), we held that a taxpayer who had been improperly reporting in prior years a pro rata portion of collections *44 on the obligations as income, was not precluded by section 446(e) from reporting on a "cost recovery" basis in the years there in issue where the facts showed that a "cost recovery" basis was the proper method of reporting for the taxpayer to use. There is no distinction in principle in this respect in the Underhill case and the instant case. See also Howard H. Perelman, supra.When a taxpayer is required by law to report income in a certain way but instead reports it in a manner inconsistent with the requirements of the statute, absent estoppel, the error in reporting income is not binding on either the taxpayer or respondent, and it is proper that the error be corrected in a subsequent year. [7]Thompson-King-Tate, Inc. v. United States, 296 F. 2d 290, 294 (C.A. 6, 1961). We hold that petitioner's ordinary income for the years here in issue should include in addition to the interest received on the land sales contracts 25 percent of the payments on principal. The evidence shows that when petitioner gave a deed to a parcel of property to a purchaser in the years here in issue, he included in his income as long-term capital gain the balance of the principal due on the land sales contract. He followed this procedure whether he received actual *46 payment in full or merely substituted a note secured by a mortgage for the land sales contract. This method of reporting the transactions was incorrect as both parties agree. When petitioner received payment in full in money, the principal payment should have been allocated between return of investment and income on the same basis as partial payments and the interest payment reported as ordinary income. When petitioner deeded the property to a purchaser and substituted a note secured by a mortgage for the land sales contract he had not made a "sale or exchange" of the land sales contract. When a person who is indebted to another in some way discharges that indebtedness, whether by payment, substitution of another evidence of indebtedness for the original, or otherwise, the original obligation has not been the subject of a "sale or exchange" but rather has been paid or discharged. In those cases where petitioner deeded the property to the purchaser and took a note secured by a mortgage in return, the record indicates that there was merely a substitution of one form of debt obligation for another. We therefore agree with petitioner that in these instances the payments of principal should *47 be treated just as if the payments on the land contracts were being continued. [8] There does not appear to be a sufficient change in the form of the indebtedness in these instances to constitute a "discharge" of the original debt by payment in property. This is not as if a purchaser had "paid" his debt on the land sales contract by giving petitioner a note which he had from another person. The purchaser merely substituted a note secured by a trust deed for a land sales contract which in substance was a note secured by a mortgage. The final issue here is whether petitioner is subject to the self-employment tax imposed by section 1401. Section 1401 imposes a tax on the self-employment income of every individual, and section 1402[9] defines earnings from self employment to include income derived by an individual from any trade or business carried on by *48 such individual. We have previously held that a taxpayer engaged in the trade or business of selling real estate is required to pay self-employment tax on his earnings as a real estate dealer. Solly K. Frankenstein, 31 T.C. 431, 436 (1958), affirmed 272 F. 2d 135 (C.A. 7, 1959), certiorari denied 362 U.S. 918 (1960). If the years before us as to self-employment tax were 1956 and 1957, it would be necessary for us to determine whether petitioner was engaged in those years in the trade or business of selling real estate. Had petitioner elected to report his income from real estate sales on an installment basis of accounting and reported income from 1956 and 1957 sales on that basis in the *49 years here in issue, it might be necessary for us to determine whether he was engaged in the trade or business of selling real estate in 1956 and 1957. Respondent points out that section 1402(a) refers to "income" derived from a trade or business and not to "income" derived from a trade or business carried on in the current year. However, we need not decide whether petitioner was engaged in a trade or business of selling real estate in 1956 and 1957 or whether section 1402(a) concerns "income" from a trade or business carried on at any time or only to a trade or business carried on in the year with respect to which the self-employment tax is being imposed. Petitioner's income in the years here in issue was from interest on an investment and the collection of an investment acquired at a discount. Petitioner's income in the years here in issue was derived from investments and was not derived from a trade or business carried on by petitioner in the years here in issue or in the years 1956 and 1957 or any other year, regardless of whether or not petitioner was engaged in carrying on the trade or business of a real estate dealer in 1956 and 1957. Decision will be entered under Rule 50. *50 Footnotes
1. All references are to the Internal Revenue Code of 1954.↩
2. Respondent in his reply brief concedes that the gain realized by petitioner on the sale of the parcel to the State of California in 1962 was long-term capital gain.↩
3. Respondent on brief concedes that the interest income shown in his notice of deficiency is overstated by $294 in 1962, $287 in 1963, and $115 in 1964 since interest payments received totaling these amounts in those years were reported by petitioner as ordinary income. Petitioner concedes that the balance of the interest payments as determined by respondent were properly reportable in each of the years by petitioner as interest income.↩
4. Petitioner first alleged that he had erroneously reported the income from the real estate sales in the years here in issue in an amendment to petition filed shortly before the trial of this case commenced. In this amendment to petition, petitioner in the alternative alleged that the sales of real estate by petitioner were not completed in 1956 and 1957 and were not completed sales until the delivery of a deed. Since the deeds were delivered more than 5 years after the contracts were entered into, petitioner alleged that the gains in the years here in issue are capital gains under sec. 1237, I.R.C. 1954. Petitioner in his brief makes no reference to this alternative allegation in his petition and has apparently abandoned this contention. In any event this record is clear that the sales were complete in 1956 and 1957 upon execution of the land sales contracts since the vendee at that time obtained equitable title to the property having assumed the burdens and benefits of ownership. Ted F. Merrill, 40 T.C. 66 (1963), affirmed per curiam 336 F. 2d 771↩ (C.A. 9, 1964).
5. SEC. 1001. DETERMINATION OF AMOUNT OF AND RECOGNITION OF GAIN OR LOSS. (a) Computation of Gain or Loss.-- The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized. (b) Amount Realized.-- The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. * * *↩
6. SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING * * * (e) Requirement Respecting Change of Accounting Method.-- Except as otherwise expressly provided in this chapter, a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall before computing his taxable income under the new method, secure the consent of the Secretary or his delegate. 7. At the trial respondent's counsel orally, in answer to petitioner's amendment to petition alleging that his income should properly have been reported by allocation of principal payments between return of investment and discount, alleged estoppel. However, the written answer filed contained no such allegation and respondent makes no estoppel argument on brief. It might be noted that a statutory recognition of the fact that inconsistent positions may properly be taken by either a taxpayer or the respondent is contained in sec. 1311- 1314, I.R.C. 1954↩, providing for mitigation of the statute of limitations under specified circumstances when either the taxpayer or Commissioner has in a later year taken an inconsistent position.
8. We did not set forth in our facts by names the contracts which were paid off in full when a deed was given and those on which payments continued in substantially the same monthly amounts as previously. This information is contained in the record and the necessary schedules can be made by the parties in preparing the Rule 50 computation.↩
9. SEC. 1402. DEFINITIONS. (a) Net Earnings From Self-Employment. - The term "net earnings from self-employment" means the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business, plus his distributive share (whether or not distributed) of income or loss described in section 702(a)(9)↩ from any trade or business carried on by a partnership of which he is a member; * * *